CINCINNATUS M. LUCAS, caveator, plaintiff in errror, vs. JAMES M. PARSONS, and others, propounders, defendants in error.

[1] Where the verdict is strongly and decidedly against the evidence, the judgment of the Court below, refusing a new trial, will be reversed.—McDONALD J. dissenting.

[2.] The terms of a proposition to compromise made to a party, and his reply thereto, are admissible in evidence against him.—McDONALD J. dissenting.

Caveat to will, in Monroe Superior Court. Tried before Judge CABANISS, at August Term, 1858.

This case was heard upon the following bill of exceptions: The evidence annexed thereto being very voluminous, and not deemed material to a full and clear understanding of the points adjudicated, is omitted. See 24 *Ga. Rep.*, 640, for a report of this case, on a former hearing before this Court.

## Bill of Exceptions.

GEORGIA, MONROE COUNTY:

Be it remembered, that on the 31st day of August, 1858, during the regular August Term of the Superior Court of said county, his Honor Eldridge G. Cabaniss, one of the Judges of the Superior Courts for this State, then and there presiding, the case of James M. Parsons and wife, Elza Holsten and wife, and Peggy Lucas, propounders of the last will and testament of Littleberry Lucas, late of said county, deceased, against Cincinnatus M. Lucas, caveator, then and there pending on the law side of said Court, being on the appeal from the Court of Ordinary, came on to be heard: and both parties having announced themselves ready, and a special jury being empanneled to try the same, the propounders opened their case to the jury, proved the *factum* of the paper propounded by the subscribing witnesses, and closed. Counsel for caveator then proceeded to open his case to the jury, and having proceeded some time in his remarks, counsel for propounders objected to his argu-

ing the case before the jury in his opening speech. The Court stated the rule to be that in the opening speech, counsel might state his points and legal positions, and the facts which he expected to prove; counsel for caveator then proceeded in his remarks, and was again called to order by counsel for propounders, on the ground that he was going into an argument on the facts before the jury. The Court replied, that counsel must obey the order of the Court, and that was that he might state his points and legal positions, and the facts which he expected to prove, but that he could not go into an argument upon those facts until they were proven, which ruling of the Court was excepted to by the counsel.

Upon the examation of Colin Mulholland, a witness introduced by caveator, counsel for caveator asked him if C. M. Lucas did not come to the warehouse of Field & Adams the day Parsons and L. Lucas was there, and after they had left, and what did C. M. Lucas say at that. time? Counsel for propounders objected to the sayings of C. M. Lucas being given in evidence, and the Court sustained the objections, and ruled that if the object of the caveator was to fix the date when Parsons and L. Lucas were at the warehouse of Field & Adams, he might ask the witness, if they were not there the day the cotton was sold, or if C. M. Lucas did not come to the warehouse the same day; but that they could not give in evidence the sayings of the caveator. After some other questions were proprounded, all of which were answered without objection, counsel for caveator asked if the Court had decided that the caveator could not prove by the witness that the caveator claimed the cotton? The Court replied that no such decision had been made. Counsel for caveator then asked the witness, if C. M. Lucas did not claim the cotton—the question was not objected to—and was answered in the affirmative by the witness, and counsel for caveator excepted.

While R. P. Trippe, Esq., was on the stand, under cross examination by caveator's counsel, caveator offered

Lucas vs. Parsons et al.

a paper to be used in evidence purporting to be a compromise, in writing, made by him to James M. Parsons and Elza Holsten, two of the propounders, and asked him if that paper was not submitted to him by one of the counsel for caveator, as a compromise, and which paper was in the following words, viz : " I propose to J. M. Parsons and Elza Holsten to divide with them equally the money, and notes, and negroes given me by my father's will, executed in July, 1845, provided they will agree to divide with me equally at my mother's death the share which she takes in the same will"—this proposition to be accepted or refused in ten days—" Oct'r 6th, 1856."

This paper was objected to by the counsel for propounders. Counsel for caveator, in his argument before the Court on this objection, stated that he expected to prove by another witness, what Dr. Parsons, (one of the propounders) said in reply to that compromise. The Court rejected the paper, on the ground, that the proposition for a compromise was testimony manufactured by caveator for himself, and counsel for caveator excepted.

Counsel for propounders in the concluding address before the jury, took the position, not that the inquisition of lunacy was void, but that it could be set aside on the ground that Littleberry Lucas, the alleged lunatic, was not before the commissioners at the time they made their verdict, and proof to that effect could be made, if a trial for that purpose could be had, and the returns of the commissioners also showed it—a similar point was made by the counsel for propounders, who addressed the jury before counsel 'in conclusion, counsel for caveator objected to counsel in conclusion proceeding in his remarks on that point, because notice of it had not been given. The Court overruled the objection on the ground that it was not true in fact, and counsel for the caveator excepted.

Counsel for propounders, in his concluding address to the jury, took the position that it was legitimate presumption that, as C. M. Lucas, as guardian of L. Lucas, had a large

amount of money and notes in his hands, he had in the dis-
charge of his duty as guardian, laid it out in Crawford coun-
ty, in which he resided, and thereby held many citizens of
that county under pecuniary obligations to him, and had ac-
quired an influence over them, and a belief of these facts by L.
Lucas, was probably the ground of his belief, that he could
not get justice in Crawford county, in a legal controversy be-
tween himself and his son, and therefore desired to leave the
county, that he might get into a county where more impar-
tial men would pass upon his rights. Counsel for caveator
objected, that there was no proof, that C. M. Lucas had laid
out any money in Crawford county, and the remarks of coun-
sel were out of order. Counsel for propounders replied,
that he admitted there was no proof that any money was
laid out by C. M. Lucas; and he had not said, nor did he
mean to say that there was any such evidence, but he did
say, and intended to say, and had the right to say, that it
was in proof that L. Lucas had been declared a lunatic; and
that his son, C. M. Lucas, was appointed his guardian by the
Ordinary of Crawford county; that the caveator, C. M. Lu-
cas, resided in that county, and had a large amount of mon-
ey and notes in his hands belonging to his father, L. Lucas,
and the presumption of law was, that he did his duty as
guardian, and kept the money of his ward at interest; and
from that state of facts he had argued that it was a legitimate
inference, that the caveator had loaned money to persons
who were citizens of Crawford county, and had them under
pecuniary obligations. To which counsel for caveator replied,
that is a legitimate argument, and no further objections was
made.

Caveator offered to prove by Samuel Hall, that he (witness)
was present at the March Term, 1856, of Crawford Superior
Court, when the case between Littleberry Lucas and Cincin-
natus M. Lucas, to revoke the letters of guardianship, was
tried; that Francis E. Bacon was sworn on said trial, and tes-
tified that he saw C. M. Lucas give said Littleberry Lucas

Lucas vs. Parsons et al.

$100 or $150 00 at Francisville; that said Francis E. is now dead; and that he was a man of undoubted character, and was entitled to full credit; which testimony was rejected by the Court and counsel for the caveator excepted.

Counsel for caveator requested the Court to charge the jury:

1st. That in presumption of law, the testator, Littleberry Lucas, was an insane lunatic, (from age and disease,) on the 2d day of April, 1855; and unless this presumption is removed by satisfactory proof the will cannot be set up; and the burden of removing it is on the propounders.

2d. That while witnesses are allowed to give their opinions, with the facts on which they are based, as to the sanity or insanity of the testator; yet the weight of the evidence is to be determined by the *facts*, rather than by their opinions.

3d. That our position is to be believed in preference to any negative ones; and that witnesses who testify to positive acts of insanity, are to be believed in preference to them who testify that they saw nothing to the contrary of his being sane, though they never examined.

4th. That while the law ordinarily gives strength to the testimony of the witnesses to the will, from the presumption that they examined the testator, yet when it is positively shown that they did not examine him, the strength given to their testimony on this presumption is withdrawn.

5th. That great caution is necessary to be observed in examining the proof of a lucid interval—that such proof is extremely difficult for this, among other reasons, viz: that the patient is not unfrequently rational to all outward appearances without any real abatement of the malady.

6th. That when delusion exists, and can be called forth on any particular subject (it being first shown by the pending of an inquisition that the alleged testator was an insane "lunatic,") then he cannot be said to be in a lucid interval, and before such lucid interval can be established, satisfactory proof must be given of the disorder having been thrown

off at the time of the alleged execution of the will, and there must be a complete interval of sanity applying to the particular act in question, and if there is anything sounding to folly, it will be conclusive to all legal purposes against the presumption of a lucid interval.

7th. That if the jury believe that Littleberry Lucas's lunacy is not traceable to any fact of circumstances connected with his son, Cincinnatus M. Lucas, but when in that condition he was impressed most unfavorably towards him, apparently without reasonable or adequate cause, and if they believe he was subsequently restored to his reason, except as to feeling towards his son, conceived when in an insane state of mind, and if he continued to suppose that his conceits, formed when in that condition, were true when they were not; and if he acted when making his will, as if they were true, and under a firm persuasion that they were true, and the will was the result of that delusion, then they must set it aside.

8th. That if Littleberry Lucas, was under a guardianship, as a person insane or lunatic, at the execution of the paper propounded, then the burden of proof is on the propounders, to show beyond a reasonable doubt, by clear and satisfactory testimony, that he had both mental capacity and freedom of will and action to make a will.

9th. That in estimating the proof of a lucid interval or restoration to sanity, when permanent proper insanity has once been established by an inquisition, little reliance is to be placed upon the opinions of witnesses, but the jury should be guided in their judgment by acts done and facts proved.

10th. Undue influence to invalidate a will varies with the strength or weakness of the testator's understanding; when the capacity is little, a smaller amount of influence will have that effect, especially when the alleged testator is under guardianship, as an insane lunatic from age and disease.; that under such circumstances excessive importunity or constant annoyance of the testator, one associating constantly with him and being intimate with him, or supposed to be a fa-

vorite with him, or having claims upon his bounty, amounts to undue influence.

11th. If Littleberry Lucas was a weak man at the making of the will, and there was any fraud practiced upon him in procuring it, or if the execution of the paper propounded was attended with circumstances that warrant a suspicion that the testator was practiced upon by imposition, then the will is void, and the jury must so find.

12th. That though a person has a right, and it is lawful for him to move a testator to give him his property, even when the testator is a person of weak judgment and easy to be persuaded, and the legacy is great—yet, if in such case, a person does so move a testator, a very strong presumption arises that the moving is of a sort not right or lawful, and only to be rebutted by bringing forward something sufficient to show the will to be such as a person of average mind, morals or family love, might be supposed willing to make.

13th. That if the jury believe there has been a great change of testamentary disposition on the part of Littleberry Lucas, and that there has been a wide departure from a favorite scheme of disposition, and without any adequate or reasonable motive for the same, especially if at the time of making the subsequent will the capacity of the testator is at all doubtful, these are circumstances strongly to show that the will is not the act of the testator, and requires strong satisfactory explanation.

14th. That in arriving at the character of the act under consideration, the terms upon which the testator stood with different members of his family are to be taken into consideration by the jury.

15th. That in determining whether a lunatic, under the control of a guardian, was restored to sanity, or in a lucid interval at the time an act was done, the jury are to look to the state of feeling and mode of thinking of the persons when sane, and if there is a prolonged departure from such feeling and modes of thinking, this is evidence of insanity; if, at the

time of the alleged lucid interval or restoration to sanity, the state of feeling and modes of thought are not such as usual to the person, while in a healthy state of mind, he cannot be said to be restored to sanity, or enjoy a lucid interval.

16th. If the alleged lunatic converses intelligently and rationally on those subjects upon which he is most deranged, then the jury may consider the lucid interval or restoration to sanity established; but if he does not so converse, it is otherwise; and the mere fact that he so converses upon indifferent subjects, affords no sufficient evidence of restoration to sanity.

17th. That the jury are to take into consideration the evidence of insanity, delusion and undue influence, if they believe there is any existing before and after the making of the will, as throwing light upon these subjects at the time of making the will, and if they believe that such insanity, delusion or undue influence existing both before and after the making of this will, this imposes upon the propounders the burden of showing, by clear and satisfactory evidence, that no such insanity, delusion or influence was operating upon his mind at the time the will was made.

18th. And if they believe these things existed before and after making this will, proof of calmess and of doing ordinary matters of business, is not sufficient to repel the presumption of insanity raised by the inquisition of lunacy and the finding of the jury, declaring him an "insane lunatic from age and disease."

19th. That the jury have no power to pass upon the validity of the will of 1845, but they are to consider it only as evidence of former testamentary disposition and intention.

20th. If the jury believe the paper propounded was made and intended as a mere temporary instrument for a purpose, and the testator intended and attempted to write another will, afterwards, settling his property on his daughters and their children, and was prevented from making such subsequent will by the acts or false messages of James M. Par-

sons, or either or all of the propounders, then they must find against the paper propounded.

All of which charge the Court gave in the words and language requested by the caveator's counsel, and without any qualification or addition except the first, which the Court qualified by striking therefrom the words, " from age and disease," and the 19th request, which the Court refused to charge in the words and language requested, to which qualifications and refusal caveator's counsel excepted.

The Court charged the jury as follows :

James M. Parsons and wife, Elza Holsten and wife, and Peggy Lucas, have brought a paper into Court, and propounded it for probate, as the last will and testament of Littleberry Lucas, deceased.

To the admission of this paper to probate and record, as the last will and testament of the deceased, Cincinnatus M. Lucas has filed objections on the following grounds, viz :

A want of testamentary capacity in the testator—that is, that at the time of the execution of this paper, as his will, he was not of sound disposing mind and memory.

That at the time said paper purports to be executed, the said Littleberry Lucas was a lunatic under commission, and not capable in law of making a will ; and also, at the time of its execution, he was laboring under an insane delusion, or hallucination, as to caveator, and was thereby greatly prejudiced against him.

And that it was obtained by the exercise of undue influence and fraudulent practices on the part of the propounders.

These are the grounds relied on by the caveator to set the paper aside as the will of the deceased.

The propounders, Parsons and wife, Holsten and wife, and Peggy Lucas, say, that the paper offered for probate is the the last will and testament of the deceased, and as such, ought to be admitted to record.

The caveator, C. M. Lucas, says that it is not his last will and

testament, but that it is void on the grounds relied upon in his caveat.

And this assertion on one side, and denial on the other, make the issue, which you must determine, and the question submitted to you for decision is: Is the paper which has been propounded for probate, the last will and testament of Little-berry Lucas? And the consideration of this question neces-sarily includes the objections relied on by the caveator. All are submitted to you for consideration and decision. The propounders bring the paper into Court, and ask that it be admitted to probate and record, as the will of the deceased. The burden is on them to prove that it is his will.

A will is the declaration of a man's mind, or intention, as to the disposition of his property to take effect after his death.

The law requires certain formalities to be observed in the execution of such an instrument; and a certain state of mind in the person executing it is necessary to give it validity. That these formalities have been observed, and that this state of mind existed at the time of the execution of the instru-ment, are facts which the person propounding the paper for probate and record must prove.

These legal formalities are, that the will was signed by the testator, and attested by three creditable witnesses, in his presence, and at his request; and the state of mind necessary to give it validity is, that he had testamentary capacity— that is, capacity to know what he was doing at the time he executed it, and that he executed it freely, voluntarily, and without compulsion.

Whether these facts have been proven in the case now be-fore you, is a question for your determination; it is for you to determine and say, whether the paper propounded for pro-bate was signed by the deceased, and attested by three cred-itable witnesses, in his presence, and at his request, and whether at that time he had a sound disposing mind and memory; or, in other words, capacity to know what he was

Lucas vs. Parsons et al.

doing, and whether he executed it freely, voluntarily, without compulsion.

If these facts have been proved, the burden of proof is removed to the other side; it then is incumbent on the caveator to show by proof, by legal testimony admitted before you, that the paper propounded for probate is not the last will and testament of the deceased. He must sustain his objections to the paper, as the will of the deceased, by proof. And this brings before you the grounds upon which the caveator relies to exclude from probate and record the paper now under consideration.

The Court will explain to you the law applicable to the several objections against the admission of the paper to probate, as the last will of the deceased. It will then be your duty to determine, according to the law, as it may then be given to you, whether the facts·proven are sufficient to set it aside, and authorize you to declare it void.

The first ground of objection is, a want of testamentary capacity in the deceased, at the time of the execution of the instrument alleged to be his will.

It is the duty of the Court to explain to you what, in law, is meant by testamentary capacity. It is your duty to determine whether the facts, which show testamentary capacity or a want of it, have been proven.

By testamentary capacity is meant a sound disposing mind, and memory—that is, the testator must have mind enough to know what he is doing, and memory to recollect what property he has to dispose of, and the person to whom he wishes to bequeath it. He must also have what the law calls the *animus testandi*—the design, the intention, that the particular paper shall be his last will and testament; or, in other words, that he intended to make a last will and testament, that he intended the paper signed by him to be that will.

To possess sufficient testamentary capacity to make a will, the law does not require a testator to have the same strength of mind, which is necessary to enable him to make contracts,

and to transact the ordinary business of life.    If he has capacity to know his property, and the persons who are to be the objects of his bounty—that is testamentary capacity, and that is all the capacity which the law requires one to possess to make a valid will.

To apply this law to the case now before you, and the paper under consideration—the question for you to consider and determine is: Were the mind and memory of the deceased sufficiently sound to enable him to know and understand the business in which he was engaged at the time he signed it, and did he intend it to be his last will and testament?    If he had such mind and memory and such intention, then he had testamentary capacity.    These are facts, which you must determine from the evidence, and you must satisfy yourselves from the testimony, whether they have been proven—and in determining this question, you must look to the time when the paper was signed by the testator, as the point at which his capacity to make a will is to be tested, and you must determine whether at that time, he possessed a sound disposing mind and memory.    He may not before or afterwards, have had such a mind and memory, as constitutes testamentary capacity, yet if at the time of executing the particular instrument, he knew what he was doing—knew what disposition he was making of his property, and knew who were to be the objects of his bounty, and the relation they sustain to him, he had testamentary capacity, and could make a valid will.    His incompetency before or after the execution of the will amounts to nothing, unless it also existed at the time when he signed the paper, and was of such a nature as to show a want of testamentary capacity at that time.    That being the point of time to which you will direct your attention to determine the capacity of the testator you will look to the testimony of the witnesses who attested the instrument, and of those who were present at its execution—all other things being equal, the law places more reliance upon the testimony of such witnesses, than it does

Lucas vs. Parsons et al.

upon those who were not present, for the obvious reason, that the law considers the attesting witnesses, as.called upon to examine into and be satisfied of the capacity of the testator to make a will.

But the Court does not mean that you are to look alone and exclusivley to the testimony of the attesting witnesses, and those who were present at the execution of the alleged will—you will look to the testimony of all the witnesses—and if their testimony is conflicting and contradictory, you must not impute perjury to any of them, but reconcile their testimony, if it can be done—but if it cannot, then take into consideration all the circumstances under which the witnesses testified.

It is a rule of evidence that when the testimony of witnesses is conflicting and contradictory, the witnesses are unimpeached—it is the duty of the jury to weigh and compare it, and reconcile it, if it can be done, so that credit may be given to each and every part of it—but if it is irreconcilable·—if it is so conflicting that the testimony of one witness cannot be believed, without disbelieving that of another, then the jury should weigh the testimony carefully—look to all the circumstances connected with the witnesses, and under which their testimony is given—their manner of testifying when they testify before you—their means of knowledge—the lapse of time since the occurrence of the events which they detail—whether the facts as to which they testify are of a recent or remote date—the failure of memory from the lapse of time—the degree of credit to be given to their memory—their capacity to judge as to the subject upon which they testify—the relation they sustain to the parties at controversy, and the bias and influence which may operate upon them—look to all these circumstances—compare and weigh the testimony, and give the preponderance to that side, which has the weight of evidence. And in determining the testamentary capacity of the testator, or the want of it, at the time of the execution of the instrument, you will also take into con-

sideration the circumstances attending its execution, which have been proven before you.

You will look to his means of knowing the contents of the paper—whether the contents were dictated by him and written in accordance with his instructions, and whether they correspond with a previous declared intention—and you are authorized to determine as to the soundness or unsoundness of the testator's mind from all these circumstances, and from his conversation and acts at the time the alleged will was made—and to satisfy yourselves what facts and circumstances attended the execution of the instrument, you must look to the testimony of the witnesses upon this point.

Another ground relied on by the caveator for setting aside the paper, which has been propounded for probate is, that at the time said paper purports to be executed, the said Littleberry Lucas was a lunatic, under commission, and not capable in law of making a will; and at the time of its execution he was laboring under an insane delusion or hallucination as to caveator, and was thereby greatly prejudiced against him.

A man who has been declared a lunatic, and placed under commission of lunacy is competent to make a will, if it be done in a lucid interval, or upon restoration to sanity, though the commission of lunacy still be in force and unrevoked. It is not necessary to revoke the commission of lunacy to enable a man who has been declared a lunatic to make a will; but to make a valid will it is necessary that he be restored to sanity, or do it in a lucid interval; and when one is declared a lunatic, and put under guardianship, the burden of proving his restoration to sanity is upon those who assert it. The presumption of law is that the lunacy continues until the contrary is made to appear. Though the deceased was under a commission of lunacy, yet, if he had a lucid interval; if at any time he was restored to sanity, it was competent for him to make a will, but the burden of proving the lucid interval, and the restoration to sanity, is

Lucas vs. Parsons et al.

upon the propounders; and the testimony upon this point must be such as to satisfy you beyond a reasonable doubt. The doubt must be à reasonable one; it must not be an imaginary one, but must actually exist, and must arise from such a state of facts, as to leave the mind in a state of hesitation on which side the truth lies.   The proof must satisfy you beyond such a doubt, that the deceased, at the time of signing the paper now before you, was restored to sanity, or did it during a lucid interval; and if an improper or undue influence was brought to bear upon the deceased to induce him to make the will, then the proof of his capacity should be clear, and strong, and undoubted; but if no such influence was brought to bear upon him  if he executed the instrument freely, voluntarily, and of his own accord, then ordinary proof of his capacity and restoration to sanity is sufficient.

But the caveator insists that at the  time of the execution of the alleged will, the testator was laboring under an insane delusion or hallucination, as to him, and was thereby greatly prejudiced against him.

Partial insanity; a delusion on some particular subject may exist; when such is the case; when the testator is deranged on a particular subject, and is rational on all other subjects, his testamentary capacity is not destroyed, unless the will is the offspring of the delusion, under which the testator is laboring, but if the act can be traced to the morbid delusion, and is the act of that delusion, then the act is void. A delusion is where one supposes a thing to be true, which is not true, and acts in reference to it, as though it were actually true, and under a firm belief that it is so.

To apply the law thus given to you by the Court to the ground of caveat under consideration :

If the deceased was laboring under a delusion of mind upon any subject at the time of the execution of his will, and the will is the result of that delusion, then it is void, though he might have been sane on all other subjects; but unless

the will be the result of such delusion, the will is not vitiated by partial insanity or delusion on a subject not affecting his mind, when the will was made.

If the deceased was laboring under an insane delusion, or hallucination, in regard to the caveator, when he made the alleged will, and was impressed unfavorably towards him, and without adequate cause, if this unfavorable impression and delusion were conceived, while in an insane state of mind, and were the result of that state of mind; and if he was subsequently restored to reason in all respects except as to the feeling towards his son, conceived when in an insane state of mind; and if he continued to suppose that his conceits, formed when in that condition, were true when they were not true, and if he acted in making his will as if they were true, and under a firm persuasion that they were true, and the will was the result of that delusion, it ought to be set aside. But on the other hand, if the deceased, before his derangement, had intended to make another will, and had made that intention known, and the will made is in conformity to such declared intention, a mere resentment against his son, not amounting to a delusion, will not vitiate the will.

Where actual insanity is proved to have once existed, either perfect recovery, or a lucid interval at the time of making the will, must be clearly proved to entitle an alleged testamentary instrument to be pronounced for as a valid will; but where it is not a case of insanity in the usual acceptation of that term, but the person making the will has been under an aberration of mind from the excessive use of intoxicating spirits, and his unsoundness of intellect is attributable to that cause, and no other, and the excitement, which deranges his mental faculties is produced by immoderate indulgence in spirituous liquors; the will of such a man is valid, if there is an absence of the excitement at the time of the act done, so far as to show that he acted with reason and deliberation, and with an understanding of what he was doing—

Lucas vs. Parsons et al.

and no other proof of restoration to soundness of mind is necessary in such a case.

If you should come to the conclusion from the testimony that the testator was incompetent to make a will at the time of the execution of this instrument, either from a want of testamentary capacity, or from an insane delusion as to the caveator, you will find for the caveator; but if you should find from the evidence that he was competent, and had testamentary capacity, and was free from an insane delusion as to his son, you will then inquire, whether the paper alleged to be the will of the deceased was obtained from him by undue influence.

To enable you to determine this question, the Court will explain what is meant by undue influence. It is as clearly defined in law as is testamentary capacity—both are so clearly defined that no one can mistake either.

Undue influence when it is shown to exist, is good ground for setting aside a will; but what amount of influence is sufficient to vitiate a will? It is this:

The influence, to vitiate the act, must amount to moral force and coercion, destroying free agency; a complete dominion over the mind of the testator must be obtained; it must not be the influence of affection and attachment; it must not be mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act;—further, there must be proof that the act was obtained by this coercion—by importunity, which could not be resisted—that it was done merely for the sake of peace; so that the motive was tantamount to force and fear. The influence exercised in procuring a will, sufficient to set it aside, must be sufficient to destroy free agency.

If the influence amounts to constraint, and prevents the free action of the testamentary capacity of the testator, then it is undue, and a will obtained by the exercise of such an influence is void—it is not the will of the testator, but of the person or persons who exercised the influence.

VOL. XXVII.—39

Whenever an improper influence is brought to bear upon the mind of one whose mental capacity is naturally imbecile, or impaired by age, intemperance, disease, or from any other cause, proof of the testamentary capacity of such a one, and of the free and voluntary execution of his will, must be clear and strong. If you believe, from the testimony in this case, that such an influence was exerted upon the testator, as constrained him to make a disposition of his property contrary to his free will and desire, you ought to set it aside; but if no such influence was exerted, you will find the paper propounded to be the last will and testament of the deceased, unless it be void on the ground of fraud, which the caveator alleges was practiced upon the testator; or in other words, that it was obtained from him by fraudulent practices.

What is meant by fraudulent practices, is deception practiced upon the testator, by which he was deceived, and induced to make a will, which, if left to himself, he would not have made, or by which, provisions were incorporated in his will, making a disposition of his property different from that which he would have made, if he had not been deceived. Such is what the Court understands to be meant by fraudulent practices. If such deception was practiced upon the testator by the propounders, or either of them; if they procured the will to be made by deception practiced upon the testator, (and you must look to the testimony of the witnesses to determine whether such be the case,) if the evidence be sufficient to satisfy you that this will was obtained by deception practiced upon the testator, then it is tainted with fraud, and should be set aside.

But when the caveator charges the will to be the result of fraud, it is incumbent on him to prove it—unless proof be adduced to show the fraud, the presumption of law is, that there was no fraud, for it is not to be presumed; it must be proved. And it may be proven by circumstantial, as well as positive and direct testimony. Fraud usually conceals itself,

Lucas vs. Parsons et al.

and it is generally by circumstances alone, that it can be detected and exposed to view; and where circumstances alone are relied on to show the fraud, these, when combined and examined, should be strong enough to satisfy the mind, beyond a reasonable doubt, of the existence of the fact they are adduced to establish. The proof, when circumstantial, must be strong enough to satisfy the consciences and understandings of reasonable men; and the question for you to determine, is, whether the testimony in this case, positive or circumstantial, is sufficient to satisfy your minds and consciences, that this will was procured to be made by fraudulent practices on the part of the propounders, or either of them; if it was, it is vitiated by the fraud, and ought to be set aside.

To sum up, in conclusion, you are to decide, from a careful consideration of all the testimony before you, whether Littleberry Lucas, had, at the time he executed this will, sufficient testamentary capacity to dispose of his property with discretion and understanding, or whether it was the result of any insane delusion as to his son, Cincinnatus M. Lucas, the caveator—if he had such capacity, and no such delusion existed, then you will inquire whether the will was obtained by the exercise of undue influence, and whether the testator was under such constraint, as destroyed his free agency, and prevented him from disposing of his property according to his own will and desire; if no such influence was exerted, then was the will obtained from him by fraudulent practices. These are the questions for you to consider and determine.

If he did not possess testamentary capacity at the time he executed the will, or if it was the result of an insane delusion as to his son, C. M. Lucas, you ought to set it aside; if it was obtained from him by undue influence, as explained to you by the Court, you ought to set it aside. Or if it was obtained by fraudulent practices on the part of the propounders, or any of them, it ought to be set aside. If any

of these grounds exist, and has been satisfactorily proven, it is sufficient to authorize you to set the will aside; but if neither ground has been proven to your satisfaction, as prudent and reasonable men, then the paper before you ought to be established as the last will and testament of Littleberry Lucas, deceased. As you may determine the facts, so let your verdict be rendered.

The Court charged, as requested by counsel for caveator, except the first and nineteenth requests. The first was modified by striking out the words "from old age and disease," and the nineteenth was refused altogether.

The jury then retired and brought in a verdict in favor of the propounders, and setting up the paper propounded as the last will and testament of Littleberry Lucas, deceased; whereupon, the caveator moved, during said term of said first mentioned Court, for a *rule nisi* for a new trial, on the following grounds:

1st. Because the Court erred in confining the counsel who opened the case for the caveator, to a bare statement of the facts the caveator expected to prove, and the statement of the legal positions he designed to hold before the Court and jury, and in refusing upon objection to that effect, made by the opposite counsel, to allow caveator's counsel to deduce from said legal position and testimony, the conclusion and references he designed to draw from the premises aforesaid, and to argue to the jury from said facts and law.

2d. Because, the Court erred in sustaining the objection made by propounder's counsel to the testimony of Colin Mulholland, stating, in order to fix the date of the conversation of which said Colin Mulholland testified, that it was on the evening C. M. Lucas came to Macon to see about the cotton stored with Field & Adams, and who said that he had come to claim the same; upon the ground that it was the sayings of said C. M. Lucas, and not a part of the *res gestæ*, and in rejecting said testimony.

3d. Because the Court erred in refusing to allow caveator

to prove by R. P. Trippe, Col. Pinkard and others, that early in October, 1856, C. M. Lucas made a proposition in writing to propounder's counsel, that if the money and notes and negroes and land, bequeathed to him by the will of 1845, constituted the ground of dissatisfaction with the will of 1845, and of fraud against him, he was ready, and offered to give them all up for distribution; that Parsons, one of the propounder, with full information of this proposition, said soon afterwards to Col. Pinkard, "If this proposition is accepted, will the old will be set up;" Col. Pinkard replied, "yes," "except so far as it is annulled by the terms of the proposition;" Parsons replied, "do you think I would accept such a proposition as that," and rejected it; and in refusing to allow the caveator to prove the declaration of Parsons, as above stated : the Court rejected the evidence on the ground, that it would be allowing caveator to manufacture evidence for himself.

4th. Because the Court erred in refusing to allow caveator to prove by Samuel Hall, that he was present at the March Term, 1856, of the Crawford Superior Court, when the case between Littleberry Lucas vs. Cincinnatus M. Lucas, to revoke the letters of guardianship of said Cincinnatus M. Lucas was tried; that Francis E. Bacon was sworn on said trial, and testified that he saw C. M. Lucas give said Littleberry Lucas $100 or $150, at Francisville; that said Francis E. is now dead, and that he was a man of undoubted character, and entitled to full credit.

5th. Because the Court erred in allowing propounder's counsel, in conclusion, to argue before the jury, that the inquisition of lunacy was void and irregular, when no notice had been given of such a ground in the preceding argument; and in overruling caveator's objection thereto ; and in allowing said propounder's counsel, to argue that C. M. Lucas had loaned out thirty or forty thousand dollars in his hands, as guardian of L. Lucas, to people of Crawford county, with a view of influencing public sentiment there in his, said

C. M. Lucas' favor, when there was no proof of such facts, and in not stopping him upon the request of caveator's counsel to that effect, and in not expressing disapprobation of his course, when said counsel declared, in the presence of the jury, that he had gotten it out, and as sensible men, they would have to be influenced by it, whether it was regular or not.

6th. Because the Court erred in refusing to give in charge in the words and language requested. the first request made by caveator's counsel, as follows: "That in presumption of law the, testator, L. Lucas, was an insane lunatic, from age and disease, on the 2d day of April, in the year 1855, and unless this presumption is removed by satisfactory proof, the will cannot be set up, and the burden of removing it is on the propounder," and in striking from them the words " from age and disease."

7th. Because the Court erred in refusing to give in charge in the words and language requested—the request of caveator's counsel as follows : If the jury believe the paper propounded was made and intended as a mere temporary instrument for a purpose, and the testator intended and attempted to write another will, afterwards, settling his property on his daughters and their children, and was prevented from making such subsequent will by the act, or false messages of James M. Parsons, or either or all of the propounders, then they must find against that paper propounded—and in refusing to charge the same, or any part thereof, and in giving no charge upon the subject embraced in said request.

8th. Because the verdict of the jury is contrary to law and evidence, and decidedly and strongly against the weight of evidence.

9th. Because the charge of the Court was abstract and general—not applied to the facts, and circumstances of the case, and was well calculated to mislead and confuse, and did, in fact, mislead and confuse the jury.

The Court refused the motion for a new trial, and counsel for caveator excepted.

STEPHENS; HALL; HILL, for plaintiff in error.

TRIPPE; POE & GRIER; NORMAN, *contra.*

*By the Court.*—LUMPKIN J. delivering the opinion.

[1.] The great question made by the record in this case, and the one chiefly argued by counsel on both sides, is, whether the Court below erred in refusing to grant a new trial on the 8th ground, in the motion for a new trial, "because the verdict was contrary to the law and evidence, and decidedly and strongly against the weight of evidence."

The evidence is voluminous, and the witnesses give different opinions, as to the capacity of the testator at, and about the time of the *factum* of the will, but the main current of facts in relation to the testator's " mind and habits, and affections," seem to be very well agreed on by nearly all the principal witnesses on both sides.   The evidence makes us distinctly acquainted with the testator as far back as twenty years before the making of the paper here set up as his will, and there is some evidence going much further back, but it is unnecessary to consider it. Prior to the winter of 1853 and 1854, the testator was a sane man; after that time, it is conceded by the propounders, that he became deranged, at least a lunatic.   The propounders insist, however, that he was restored to his reason, or at least had a lucid interval, on the 2d day of April, 1855, and this is denied by the caveator, and this is the main issue.

Before the loss of his reason, Dr. Hall says he was "a clear headed, discriminating person in ordinary business matters, respectful and decent in his deportment."   All the witnesses who speak on this point, corroborate this statement. He was a practical, thriving business man, careful with his

property, very successful in farming, and in the use of money; he was a drinking man, and sometimes drank too much; and when drinking fond of jesting; "but he was never irrational," "never indecent in his deportment," never substituted "imaginary things for facts," even when he had drunk too much. "He was just as hard to trade with under the influence of liquor, as at any other time."

. He had great domestic troubles; he and his wife did not live happily together; her temper was unfortunately affected by a hysterical disorder, but this kind of life was not uniform and continuous; there were times when her temper gave way, and then there was greater harmony in the household. At times, they did not speak to each other, nor did they room together. He often complained of his hardships in these respects, and declared his domestic troubles drove him to drinking. A poor, but common refuge in such cases. Many other evidences of unhappiness are stated in the record, which I need not repeat. He had two daughters; one married Elza Holsten, and the other married James M. Parsons; neither married to suit him. The last, especially, married clandestinely, and very much against his will; for sometime after this marriage, the witnesses say, the testator "hated Parsons;" afterwards he said he would make the best of it, and some of the witnesses say "he came to respect Dr. Parsons;" Holsten, he declared, was not of much force any way. It is very clearly shown, that always before his insanity, Littleberry Lucas declared, neither of these men should ever have his property "*if he died in his right mind.*"

The testator had one son, the caveator in this case; in this son, and his family, this old man seems to have found all his happiness. Our brother Hill speaks of this son as the old man's cloud by day, and pillar of fire by night," and even our brother Trippe, the counsel for the propounders, admits that Cincinnatus M. Lucas "was at once the old man's Reuben and Benjamin." With a force which a glad

father's heart alone could express, the testator was in the habit of declaring that "Nat, his son, was all a father's heart could wish." After a careful examination of the evidence, we must admit, that none of these eulogies can be called extravagant. As a natural result, this son had all his father's confidence. He kept his money and notes, attended to all his business, "helped him to make what he had," and it seemed to be the father's delight to do just as his son said. He bought a new secretary for the safe keeping of his papers, and had it carried, not to his own, but to Nat's house. If a neighbor came to borrow money, he sent him "to Natty;" if cotton was to be sold, or an overseer employed, or anything else done, "Natty" must do it. The wisdom of this confidence is seen in the result—the old man continued to grow rich. With this clear head, and these fixed affections, old Mr. Lucas, sometime before 1845, called on his neighbor, Mr Lester, to write his will; it was very carefully prepared. The testator and the scrivener, at the instance of the first, sought a retired place, and Mr. Lucas had his plan for disposing of his large estate, all arranged; he gave his wife a competency; he settled upon his daughters, portions for life, remainder to their children; he gave Cincinnatus's sons a special legacy "to perpetuate his name," as he said; he gave his faithful old negroes, "who had worked with him, and through the heat and burthen of the day," to his son, for "Natty would take good care of them;" he stated to Mr. Lester his reasons at the time, for so making his will, and for giving his son's family the advantage, and they are in strict accordance with the facts above stated; "it was a rational act, and rationally done."

Some time after this, he bought a plantation west of Flint River, and put certain negroes on it; this he did for his son's "boy children;" he bought it for them, and gave it to them, and often spoke of it, and gave his reasons for it. Many of the witnesses detail many facts showing the old man's fixed purpose in this regard. To fix this property on Nat's boys,

as a gift from their grandfather, in token of his affection for them, and their father and mother, "and to perpetuate his name;" he destroyed the will drawn by Mr. Lester, and on the 7th day of July, 1845, made another; this will was also made with great care; it was drawn by his confidential attorney, is elaborate, and well planned, and precisely as the one described by Mr. Lester, with the exception of the change of legacies to the children of his son. At this time, Littleberry Lucas lived in Monroe county; in 1847, he applied to the Legislature to change the county lines, so as to include him in the county of Crawford, stating in his sworn petition for this purpose, that he had made his will, that his son was appointed his executor; that most of his lands and property lay in the county of Crawford, where also his son lived, and for the convenience of his son in executing his will, he wished to be placed in the county of Crawford; the Legislature granted his petition; afterwards, at the session of 1851–'52, an Act was passed repealing generally the former Acts changing the county lines, and this placed Littleberry Lucas back in the county of Monroe; to the very next session of 1853–'54, he sent his petition to be placed back again into Crawford county; he asked Col. Hunter to assist Mr. Culverhouse and Ray, in getting this bill passed, as he was thrown back into the county of Monroe, against his wish, and wished to be placed again in Crawford, for the convenience of his executor; this bill was also passed, and approved the 13th day of February, 1854; he also became dissatisfied with some decisions of this Court, because he had understood they conflicted with the settlement of his daughter's; he brought his will to his lawyer, Col. Hunter, in the fall of 1853, as Col. H. recollects, for examination in this particular, and when informed that his will did not conflict with the decisions of the Supreme Court, he expressed himself pleased, and again expressed his particular satisfaction with these portions of his will, and repeated the same reasons for them which he had given so often before. Up to this

period, and to these points, the testimony is clear, strong, and unbroken. By the will of 1845, he gave his money and notes, to his son Cincinnatus; some three of the witnesses think he expressed a dissatisfaction with this portion of his will before his derangement; Mr. Banks says he spoke to him to write a new will on this account, in May, 1853, but did not say how he would make it otherwise, and never appointed a time to attend to it. Mr. Woodward and Mr. Jackson also spoke of hearing similar remarks before his derangement, but they are not certain as to the time. Admissions and casual remarks, unless well remembered, and distinctly repeated, furnish very weak evidence.

We know the human memory is at fault, in nothing more than dates, unless particularly charged to remember them.

Most clearly, therefore, the will of 1845 contained and represented the testamentary intentions of Littleberry Lucas, when sane, and admitted, on all hands to have been sane. The time when Mr. Lucas became insane is not definitely fixed; Dr. Hall, an experienced physician, discovered some symptoms of it, he thinks, as far back as shortly after 1850; he was getting quite old—near the period allotted for man to live; his insanity was doubtless produced by a combination of causes; the manifestations of the malady of madness were numerous, and unmistakeable; we will mention some of the more prominent, for the purpose of tracing with more certainty, the evidences of his condition on the 2d day of April, 1855.

With a few immaterial exceptions of *opinions* to the contrary, it is conceded by all, that this old man had not his reason in 1851; he lost all sense of decency in the presence of ladies; he was untruthful; he offered a young lady $200, and when she refused to receive it, he was about to burn it in his pipe, and was only prevented by her consenting to take it; he was traveling over the country declaring his wife was dead, and he wanted to marry again; addressed several ladies; offered to buy a wife, at prices varying from

small sums, or a few negroes, up to $20,000; he declared he could buy a wife, and would do it; (was this madness? Quere;) when corrected in any of his wild notions, he would get angry, and insist he was right; he insulted his own sister-in-law, at her own table; was offering to sell his negroes at times, for the wildest prices, and then for almost nothing; all the family united in having him declared *non compos*; and in having a guardian appointed under our statute; accordingly, a commission was sued out, on the 30th day of June, 1854, he was declared an insane lunatic from age and disease, and incapable of managing his own affairs;" his son was appointed his guardian; his affections entirely changed; he took up with Parsons and Holsten, and his hatred for his son was the most intense; he would curse him as the d——st rascal, and rogue, and fool, that ever lived; charged him with stealing his will, and his property, and declared he intended to make a will, and cut him off with $5, as being all the law allowed him. All these manifestations of insanity are testified to by many witnesses; pages could be filled with his sayings and doings, illustrating this sad condition.

Was he restored, or at least, did he have a lucid interval when he executed the paper propounded? It is scarcely possible to be too strongly impressed with the great degree of caution necessary to be observed in the examination of the proof of a lucid interval. *White vs. Dwyer*, 1 *Ecc. R.* 46. In cases of insanity proper, this proof is often matter of extreme difficulty, because the patient so affected is not unfrequently rational to all outward appearance, without any real abatement of his malady, so that in truth and substance, he is just as insane in his *apparently* rational, as he is in his visible raving fits. *Brogden vs. Brown*, 2 *Ecc. R.* 369.

These considerations render it necessary for the Courts and juries to rely but little upon mere opinions, but to look at the *grounds* upon which opinions are formed, and to be guided in their own judgments by *facts* proved, and by *acts*

done, rather than by the judgment of others. *Kinleside vs. Harrison*, 1 *Ecc. R.* 296 ; 1 *Williams on Executors*, 2d *Am. Ed.* 18.

When general lunacy is once shown, it is not sufficient in order, to establish a lucid interval, to show merely a cessation of the violent symptoms of the disorder, but a restoration of the faculties of the mind, sufficient to enable the party soundly to judge of the act. *Hall vs. Warner* 9 *Ves.* 611.

Was Littleberry Lucas so far restored as to be able to comprehend the condition of his family and property, to remember his affections, obligations, and former testamentary intentions? Was he relieved of his delusions in regard to his son, or did he act on these delusions?

After a careful examination of the facts proved, and acts done, we find every exhibition of insanity existing in 1854, continuing in 1855, and many of the most palpable evidences of such insanity shown in this record, occurred in 1855—many of them a short time before, and many a short time after the 2d day of April, and on that very day, we find several strong "soundings to folly," declared by the authorities to be proof, in spite of apparent calmness, of the continuance of the malady.

Let us state a few clearly proven instances, as samples of many in this heavy record. Dr. Hall says: "I had a meeting with him, (L. Lucas) I think in March, 1855, a short time before the April Term of the Court of Ordinary, for the purpose of bringing about a reconciliation between him and his son; I asked him in the street, if he had been to see Nat; he said no, that he had as soon go to hell as to go there; that Nat was a damned rascal, and a damned rogue, and made use of the most violent and abusive terms." Dr. Hall attempted to reason with him, and correct his mistaken imaginations about Nat's conduct, when "he renewed his abuse of his son in such a violent and abusive manner, that concluded he was still laboring under his derangement;"

" he was sober at the time, and the indications of insanity I allude to, I did not think the effects of drink operating at the time, or produced by liquor recently taken." George Rosseau, a brother-in-law to Littleberry Lucas, says, "he also visited my house in 1855; while here he said a man that was not worth $70,000, ought to be kicked out of hell; he also said he did not know whether there was any hell or not, and he be damned if he was going to trouble himself about it. There was a quilting at my house while he was here, and when the quilt was finished, he proposed to a lady of as much respectability as any in this, or any other county, that they would wrap up in the quilt, and go to bed; this was said in the presence and hearing of several persons, and I should not have allowed him to stay in the house, but from the fact that I regarded him as an insane man; he did not drink any spirits while here the last time, nor did I consider him drunk when he came here."

*William H. Griffith* says, that the " *latter part of March, or early in April,* 1855, he had a conversation with L. Lucas, in which he spoke of Nat as a rogue, a rascal, *and the most hateful of men;* said Nat *pretended* to have some Court papers giving him his property; *that he knew all about such papers,* and that Nat could tear them up if he would; that he and Nat could agree, and put them out of the way, and he wanted Nat to do it, but he would'nt, damn him; no such rascal shall ever have anything I have got; he shall come to the plough, damn him."

*Samuel P. Corbin* says: "A man had died, and been put into a metallic coffin; the coffin was brought to my house, and Littleberry Lucas took a complete view of it, felt it, and knocked it with his knife—seemed amazed, and made many foolish remarks about it, illy becoming the occasion; he then said, "when I die, I want one of these things to be buried in; the devil can never get a man when he is boxed up in one of these." This was not said jestingly; he said it with a countenance as solemn as he ever wore;

he seemed to speak it, as if he believed what he said.   This was about the 1st of May, 1855; I saw him in *March*, and *April*, of the same year, and he was as crazy then, as at any time before, or after."

On the very day of making the will, he requested J. M. Simmons, one of the witnesses to the will, to tell "his brother not to send his note to Nat Lucas, that he intended to have his business out of Nat's hands;" and yet, when sane, and for years, no one else could be trusted with his business." *Woodward*, another witness to the will says, that L. Lucas "said, after he made his will, that if Nat Lucas did not give him up his property, he would be damned if he did not cut him off with five dollars; said so before."

*John Anderson*, a witness to the will says, he saw Mr. Preston, in Knoxville, on the day the paper propounded was written.   Mr. Preston's depositions were read, and he says he saw L. Lucas in Knoxville about the last of March, or the first of April, 1855, and he further says, that deceased "called Nat many ugly names, and cursed him dreadfully; he spoke of Nat as the most hateful of men; he found it difficult to find words of sufficient force to express his spite; he was then insane;" he said at Knoxville, in my hearing, that he did not mean to give Nat anything, because he was the damnedest rascal he ever saw.

On the night of the very day he made the present will, he told B. F. Pritchard "he *intended* to make a will, and do as he pleased with his property."

Mr. Knott says, "In the Spring of 1855, while L. Lucas was in Macon, he told me he had been offered 14 cents for his cotton, which was about 4 cents over, what any other cotton would have brought that day, and during the same day, speaking of the birth of children, said he recollected well when the granny came to his birth; some one told him he must be mistaken; he said, oh no, he was not."

A. W. Wyche was present at the time spoken of by Mr. Knott, and was the man who asked deceased, if he was not joking

Lucas said " no, and then reaffirmed it to show the strength of his memory. He went on further to say, in the same earnest manner, that he remembered when the granny entered the room when he was born, and he described her, how she looked, &c." Both these witnesses examined closely to see if he was under the influence of liquor, but both became satisfied that he was not, and that he acted and talked as a crazy man, and not as a drinking man. Previously when sane, he had always gone to Macon with his son, and did just as he said. Now, at the time alluded to, Dr. Parsons accompanied him, and on that same day, deceased said " he had more sense in his little finger than Nat had in his head, and he cursed him for a damned rascal, and a damned fool, &c."

In May, 1855, he offered to give in his property to the Receiver of Tax returns in Taylor county. He had about sixty negroes there, but represented them as about 42 ; insisting that small ones who did not work, should not be given in. He had a good plantation of about 1000 acres, and this with the 42 negroes, he valued at about ($2,700) *twenty-seven hundred dollars.* The sensible Tax Receiver would not allow him to swear to it, because he thought him crazy. This is testified to by three witnesses, who say he was not drunk at the time, but crazy. If he had sworn to this valuation, would any jury on earth, have found him guilty of false swearing? His son returned the same property at near $40,000.

" Facts proved, and acts done," showing this condition of mind, are multiplied by more than a score of witnesses which need not be, and cannot be repeated. They cover the whole of the year 1855. The danger of relying upon opinions *in a case like this,* as wisely remarked by Sir John Nicholl as above quoted, is strongly illustrated in this case. For the witnesses who *think* he was rational, give it as their opinion, that he was sane, *having no indications,* of derangement, the whole of the year 1855 ; the very period when the *facts* testified to, occurred. Some of them say he was restor-

ed in the fall of 1854, and one or two intimate, as their opinion, that he never was deranged. Some people seem to think a man is not *crazy* unless he is *frantic.* That Mr. Lucas was often calm, and quiet, and loaned money to Mr. Jackson on one occasion, and shaved a note for Dr. Simmons, on another, and did so with apparent reason, we do not doubt. Many lunatics, and deranged men have done many things requiring much more thought, and judgment. Doubtless Mr. Huckaby honestly thought Mr. Lucas, was as sound as any man, when he sent for him to mend the harness, &c.; and that too, notwithstanding Mr. Lucas concluded he would himself " tan the leather to mend the harness," and Mr. Huckaby himself thought the harness were not worth mending at all.

The circumstances also, under which this paper was written, cannot help the propounders on the question of sanity. The deceased was mad, excited because his son had continued the application to revoke the letters of guardianship. The will was made in the Court room ; no deliberation, no plan arranged, no good feeling for that son who was once all a father's heart could wish a son to be; in every respect so different from the circumstances under which he had written and prepared two wills before. To settle his daughters' portions to their separate use, and " extend his property over to his grand children," and make a special bequest to Nat's boys, " to perpetuate his name," were always the cherished intentions of this old man when sane. They were the great features of two former wills. To execute this testamentary intention, he applied to two sessions of the Legislature, to place his residence in Crawford county, where his son, and executor lived. He became dissatisfied with a decision of this Court, because he heard it interferred with one of these provisions in his will. He never did, so far as the proof goes, abandon either of these intentions. He never, while sane, tolerated any other contrary intention. These were his great, his fixed, his life long testamentary intentions.

The record of his sane moments is unbroken, and full of them. All his family and neighbors knew them. And yet when he executed the paper now propounded, it does not appear that he even *recollected* either of these former purposes. Yet this paper defeats these cherished objects, and for only one recited reason of dissatisfaction with his former will—a dissatisfaction which could have been fully remedied by a codicil of five lines.

There is yet another view of this case which materially weakens the cause of the propounders. Even if Mr. Lucas probably had testamentary capacity, it is clear he was of *weak mind.* "Unquestionably," says Sir John Nicholl, in speaking of the will of one under commission of lunacy, "there must be a *complete* and *absolute* proof that the party who had so formed it, (the will) did it without any assistance." *Cartright vs. Cartright,* 9 *Ecc. R.* 51. We are not satisfied that the paper propounded is the free, and voluntary testamentary act of Littleberry Lucas. With such a revolution of testamentary intention while in the care of those benefitted by the change, and under such circumstances of suspicion, and weakness of mind, the law must have strong proof of both volition and capacity. *Walker vs. Hunter, et al.,* 7 *Ga. R.,* 414, *Wynn vs. Robinson,* 4 *Ecc. R.* 82 ; *Brydges vs. King, Ib,* 113 ; *Ingrain vs. Tryatt, Ib,* 191, 204.

The evidence in this case presents some strong proof of fraud, and *significant activity,* to say the least of it. The deceased was *helped* in various ways.

All the family wanted a "trustee" appointed for him. Dr. Parsons was especially urgent, and thought *Nat* was the man who ought to be appointed. After Nat's appointment, the propounders became the best friends of the deceased, and his special keepers. Dr. Parsons "treated Littleberry Lucas, while in Lucas' presence kindly, and as a sane man, but away from said Lucas, he treated him as an "insane man." He bid off land for the deceased at Smith's sale. He, and Holsten helped the deceased to sell his cotton, over the head

and wishes of his guardian. Dr. P. first applied to Col. Trippe to bring the *rule nisi,* to revoke the commission of lunacy, and was the active man in getting up the witnesses. It does not appear that either of the propounders made any effort to disabuse the father's mind in regard to the conduct of his son. According to the old man's ravings they were active in embittering him against his son.

Again, the old man is raving—anxious, apparently, to get the commission of lunacy revoked, but Parsons says to Col. Hunter, "if C. M. Lucas will *give up the old will no steps will be taken to revoke the letters."*

The' old man is raving, because under the old will, Nat is to get all his money, and notes, and says he wants to alter it for that reason. But Parsons told C. M. Lucas, at Smith's sale, in the presence of Woodward, "*if he would give up the old will he might keep the money and notes."* In no case would the granting of the propositions of Parsons have accomplished the wishes of deceased, and yet he pretends to have acted for deceased. In February or March, 1856, the old man seems determined to move to Monroe county; (while sane, he was very anxious to die in Crawford.) It was a bad season of the year to get a place. The old man was very old, was bed ridden, and unable to move without assistance. But Parsons declared he would move him to Monroe, if he had to move him to a shelter. No other place being available, Holsten finally gives up the place he was living on in Monroe, and thither the old man is carried, *to die.* After this removal to Monroe, *Holsten* said he *thought the new will would stand.* In the summer of 1856, another will was spoken of. Mrs. Peggy Lucas sent for Dr. Stephens, Dr. Searcy and Dr. Simmons to examine the old man and see if he was then competent to make a will. They met, and so pronounced him, and a time was appointed for the will to be executed by these physicians. This proceeding thus far was without the knowledge of Dr. Parsons. But before the day arrived to execute the will, he found it out.

He, *Parsons*, told Dr. Simmons not to come, because the women had deceived him, that the old man already had a will. He then went to Forsyth, and told Dr. Stephens he *need not come*, as the old man was sinking, &c.    He wrote to Dr. Searcy not to come, " because Dr. Stephens would not be there." Mr. Hollis heard the discussion between Dr. Parsons, and the women, on the subject of the will.    Mrs. Lucas and Mrs. Parsons wanted a will *settling the property on the daughters*, but Dr. Parsons *was afraid* it would affect the *revocation.* Dr. Stephens, on reflection, did go down on the day appointed to write the new will, but no one was there but the old man, and the women.    The old man was sleepy, and the women " had concluded to be satisfied."    *We* are not *satisfied*, either that the paper propounded was executed during a lucid interval, or that in the weak condition of the mind of the deceased, the will was not the result of undue influence. The burden was on the propounders, and the weight of the evidence is strongly and decidedly against them.    We think the Court erred in not granting a new trial on this ground. For myself, I will say that when this case was up here before, my mind inclined to this opinion.    After a full re-examination and argument, with the additional evidence, I do not, and cannot entertain a doubt on this point.    24 *Ga. R.,* 663.

But it has been insisted that the paper itself is sufficient evidence of sanity, because it divides the property equally. *Cartright vs. Cartright,* is relied on for this position.    On examination, the will of Armyne Cartright will be found in every respect different from the one before us.    That will gave all the property to one side of the house, and yet it was said to be natural.    Why?    Because it was in strict accordance *with the attachment* of the deceased, and her testamentary intentions while sane.    This is not pretended for the will of Littleberry Lucas.    Miss Cartright wrote her own will alone, and there was *absolute proof* of absence of fraud, and undue influence.    The very essence of a will is the *wish* of

the testator. His *affections*, therefore, rather than apparent equality, is the true test of a natural will. According to the judgment and feelings of Littleberry Lucas, for many years of his sane life, a will equal on its *face* was not equal in *fact*, and did not represent his *wishes*. In *Cartright vs. Cartright*, Sir William Wynne said, " it was a proper and natural will, and *conformable to what her affections were proved to be at the time*." Where is the slightest evidence in this whole record, that Littleberry Lucas ever did for a moment change his affections and intentions as represented in the fourteen first items of the will of 1845 ? Was not one of the very last acts of his sane life a solemn reaffirmance of that whole will ?

[2.] During the progress of the trial, and while Col. Trippe was on the stand, the caveator's counsel sought to prove by him the submission to propounders by caveator, of the following proposition to compromise the case, viz: " I propose to J. M. Parsons and Elza Holsten to divide with them equally the money, and notes, and negroes, given me by my father's will, executed, in July, 1845, provided they will agree to divide with me equally at my mother's d ath, the share which she takes in the same will. This proposition to be accepted or rejected in ten days. Oct. 6th, 1855." Signed, by C. M. Lucas. The caveator's counsel further stated to the Court that they expected to shew that Parsons replied to this proposition as follows: " If this proposition is accepted will the old will be set up ?" Col. Pinckard said " yes, except so far as it is annulled by the terms of the proposition." Then Parsons replied, " do you think I would accept such a proposition as that," and rejected it. The only purpose of introducing the proposition was to make the reply intelligible, and the object of proving the reply, was to show that the propounders were not opposed to the old will of 1845, because the money and notes were left to C. M. Lucas; the ground which caveator insists was always put in the mouth of deceased while deranged, but because of the settlements to the

separate use of the daughters, and the special legacy to C. M. Lucas' children. The Court rejected the evidence on the ground, that it was enabling caveator to manufacture evidence for himself. We do not see how caveator manufactured the reply of Parsons, and that is the real evidence sought. Our brother Trippe is very indignant, because the proposition does not include Mrs. Lucas. A sufficient reply to that is, that Dr. Parsons did not reject it for that reason, and his reply is the real evidence sought.

The evidence proposed, is the sayings of a party to the record, and is certainly good against him, and against all, who, with him, seek to set up a paper which the caveator alleges was fraudulently procured. We think the evidence was admissible, and reverse the Court below, also, on this ground.

Judgment reversed.

BENNING J. concurring.

The Court are unanimous, that all of the decisions complained of, except two, ought to be affirmed. As to those two, they are not unanimous. Judge LUMPKIN and myself, thinking, that those two were erroneous, Judge McDONALD thinking, that they were not erroneous. The opinion of the Court, on all of the decisions complained of, except those two, will be stated by Judge McDONALD.* I shall therefore, confine myself to those two.

Of them, the first is thus set forth in the bill of exceptions: " While R. P. Trippe, Esq., was on the stand under cross examination by caveator's counsel, caveator offered a paper, to be used in evidence, purporting to be a compromise in writing, made by him to James M. Parsons and Elza Holsten, two of the propounders, and asked him, if that paper was not submitted to him by one of the counsel for caveator,

---

* The opinion of Judge McDONALD here referred to, has not been furnished to me.—*Reporter.*

as a compromise, and which paper was in the following words, viz: "I propose to J. M. Parsons and Elza Holsten, to divide with them equally, the money, and notes, and negroes, given me by my father's will, executed in July, 1845, provided, they will agree to divide with me, equally, at my mother's death, the share which she takes in the same will—this proposition to be accepted, or refused in ten days. October 6th, 1856."

"The paper was objected to by the counsel for propounders. Counsel for caveator in his argument before the Court, on this objection, stated, that he expected to prove by another witness, what Dr. Parsons, (one of the propounders,) said in reply to that compromise." And what Dr. Parsons said in reply to it, was as follows—"If this proposition is accepted, will the old will be set up?" Col. Pinckard, replied: "Yes, except so far as it is annulled by the terms of the proposition"—Parson's replied: "Do you think I would accept such a proposition as that;" and rejected it.

The Court rejected the evidence, and that is the decision complained of.

The question, therefore, is, was the decision right?

In other words, was the caveator entitled to have before the jury, Parsons's reply to the proposition?

The will of 1845, made provision for the wife and children of Parsons, but made none for Parsons himself. The reply of Parsons betrays extreme hostility to that will. The property which C. M. Lucas thus proposed to divide with Parsons and Holsten, was valuable, amounting, according to some of the testimony, to, as much, I believe, as forty thousand dollars, yet Parsons's repugnance to the old will was so great, that he preferred to reject a third of this property, and stand the chances for establishing the new will.

It is true then, that his hostility to this old will, was extreme.

Was it competent in the caveator, to show, that Parsons entertained such a feeling of hostility to that will? The an-

swer to this question, depends on whether that fact would, or would not, be material to any of the issues.

Among the grounds of the caveat, are these two; that the new will was obtained by the propounders, by undue influence; that it was obtained by fraud. Parsons was one of the propounders. Among the issues then, were those of undue influence and fraud, in Parsons. Now, whatever was *material* to these, two issues, was admissible in evidence. And it was, certainly, material to those issues, whether Parsons had, or had not, a motive or cause, for resort to undue influence or fraud; as, it is material, on an issue of murder, whether the accused had, or had not, a motive to kill. True, in this last case, the mere existence of the motive, (hate or friendship,) is not sufficient to establish guilt or innocence— but, still, it is a fact *material* to the issue of guilt or innocence. So, although, it may be true, that the mere existence in Parsons of a motive for a resort to fraud or undue influence, would not be sufficient to convict him of fraud or undue influence, yet it would equally be a fact *material* to the issue, whether he was, or was not, guilty of the fraud or undue influence. It would be a fact, which, though, not sufficient of itself, to establish guilt or innocence, might be sufficient, with other facts, to do so.

If then, there existed in Parsons, a motive for the use of fraud or undue influence, it was a fact material to the issues as to fraud or undue influence, and therefore, was a fact admissible in evidence on those issues. And, of course, any facts going to show this fact; that is, going to show the existence of this motive in Parsons, would also be admissible.

Now extreme hostility in Parsons, to the old will, would be a fact going to show a motive in him to resort to any means, not excepting fraud or undue influence, to get rid of that will. Therefore, any fact going to show this hostility in him, would be admissible as evidence. His reply to the proposition for a compromise, was a fact going to show this hostility.

My conclusion, then, is, that this reply was admissible as evidence. Of course, I think, that the proposition ought to go with it, to make it intelligible. What it would be worth, when admitted, would depend on what other facts were in evidence. By itself, it would not be sufficient, to establish fraud or undue influence.

The other of the two decisions, is, the decision that the verdict was not decidedly and strongly, against the weight of the evidence. In my opinion, this decision was erroneous. In my opinion the verdict *was* decidedly and strongly, against the weight of the evidence. The evidence is voluminous, and it would take much more time, than I have to spare, to give my reasons in detail for this opinion. I will simply remark, that, as Littleberry Lucas had been found a lunatic by due judgment of a proper tribunal, which judgment was still in force when the new will was made, the onus was on those who propounded that will, to show, *beyond a reasonable doubt*, that he was not a lunatic at the time when he made that will. This I think, they were far from showing.

McDONALD J. dissenting.